ANNETTE L. HURST (SBN 148738)
*Email: ahurst@orrick.com*
SCOTT LONARDO (SBN 285001)
*Email: slonardo@orrick.com*
ROBERT L. URIARTE (SBN 258274)
*Email: ruriarte@orrick.com*
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, California 94105-2669
Telephone:     (415) 773-5700
Facsimile:     (415) 773-5759

E. JOSHUA ROSENKRANZ (*Pro Hac Vice Pending*)
*Email: jrosenkranz@orrick.com*
JEREMY PETERMAN(*Pro Hac Vice Pending*)
*Email: jpeterman@orrick.com*
ORRICK HERRINGTON & SUTCLIFFE LLP
51 W. 52nd Street
New York, NY 10019
Telephone:     (212) 506-5000
Facsimile:     (212) 506-5151

JOSHUA G. STEIN (SBN 219016)
*Email: jstein@zenefits.com*
YOURPEOPLE, INC.
303 2nd Street, Ste. 401
San Francisco, CA 94107
Telephone:     (415) 917-2359
Facsimile:

Attorneys for Defendants
YOURPEOPLE, INC., and PARKER CONRAD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADP, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>YOURPEOPLE, INC., a Delaware corporation d.b.a Zenefits Insurance Services, and PARKER CONRAD, an individual,<br><br>Defendants. | Case No. 4:15-cv-02560-JSW<br><br>**DEFENDANTS' ANTI-SLAPP SPECIAL MOTION TO STRIKE FIRST THROUGH THIRD CLAIMS FOR RELIEF**<br><br>Date:        August 28, 2015<br>Time:        9:00 A.M.<br>Dept:        Oakland Courthouse,<br>             Courtroom 5 - 2nd Floor<br>Judge:       Hon. Jeffrey S. White |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE*
*CASE NO. 4:15-CV-02560-JSW*

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFF AND ITS COUNSEL OF RECORD:

Please take notice that on August 28, 2015 at 9:00 a.m., or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable Jeffrey S. White, Courtroom 5, 2d Floor, United States District Court, 1301 Clay Street, Oakland, California, Defendants YourPeople, Inc. dba Zenefits Insurance Services ("Zenefits"), and its Chief Executive Officer Conrad Parker will, and hereby do, move the Court, pursuant to California Code of Civil Procedure Section 425.16, for an order striking the first, second, and third claims for relief alleged in Plaintiff's Complaint, with prejudice.  This special motion to strike is brought on the grounds that Plaintiff's first, second, and third claims for relief are based on protected speech on matters of public concern, and that Plaintiff cannot establish a probability of success on the merits of these claims.

This Motion to Strike is based upon the Complaint filed herein, Dkt. No. 1, Defendants' Motion to Dismiss, Request for Judicial Notice, and Declarations of Jeffrey Hazard, Glynn Morrison, Laura Kreitler, and Robert Uriarte filed herewith, as well as such other and further papers or argument as may be presented to the Court prior to or at the hearing of the Special Motion to Strike.

Dated: July 6, 2015

ANNETTE L. HURST
SCOTT LONARDO
ROBERT L. URIARTE
Orrick, Herrington & Sutcliffe LLP


By:  _/s/ Annette L. Hurst_
ANNETTE L. HURST

Attorneys for Defendants ZENEFITS and PARKER CONRAD

Orrick, Herrington &
Sutcliffe LLP
Attorneys at Law
San Francisco

i

Defendants' Anti-SLAPP Motion To Strike
Case No. 4:15-cv-02560-JSW

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................................ i

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

    A.    Zenefits Is A Cloud-Based Marketplace Offering Human Resources Automation And Efficient Services For Small Businesses .................................. 2

    B.    Zenefits Begins Synchronizing Customer Data With ADP In 2013 ..................... 3

    C.    The Zenefits-ADP Partner Agreement and Close Working Relationship ............. 5

    D.    ADP Begins FUDing Zenefits Without Warning or Explanation ......................... 5

    E.    After Starting A Public Battle And Declaring It Would "Let The Marketplace Decide," ADP Then Tries to Silence Zenefits Through Legal Action ................................................................................................................. 6

ARGUMENT ..................................................................................................................... 8

I.    ADP'S CLAIMS ARE A DIRECT ASSAULT ON SPEECH IN A PUBLIC FORUM ABOUT AN ISSUE OF PUBLIC CONCERN ................................................... 8

    A.    The Challenged Statements Were Made In A "Public Forum." ........................... 8

    B.    The Challenged Statements Directly Concern The Public Interest In Preventing ADP's Data Lock-in ......................................................................... 9

II.    ADP CANNOT SHOW A PROBABILITY OF SUCCEEDING ON ITS CLAIMS ....... 11

    A.    ADP's First Claim For Defamation Fails Because Zenefits' Statements Are Non-Actionable Opinion ................................................................................... 11

    B.    The Defamation Claim Also Fails Because Any Factual Assertions Are True. ................................................................................................................. 12

    C.    ADP Cannot Show The Independently Wrongful Conduct Necessary To Sustain Its Second Claim For Relief For Intentional Interference ...................... 14

    D.    ADP Cannot Show That Zenefits' Statements Resulted in Unlawful, Fraudulent, or Anti-Competitive Acts Or Practices .......................................... 15

III.    THE CLAIMS SHOULD BE STRICKEN WITH PREJUDICE ................................... 15

CONCLUSION ................................................................................................................. 15

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-CV-02560-JSW

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Barrett v. Rosenthal*,
5   40 Cal. 4th 33 (2006) ...................................................................................................9

6   *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
7   20 Cal. 4th 163 (1999) ...............................................................................................15

8   *Damon v. Ocean Hills Journalism Club*,
   85 Cal. App. 4th 468 (2000)...............................................................................8, 9, 10

9   *Flores v. Emerich & Fike*,
10   No. 1:05–CV–0291 OWW DLB, 2006 WL 2536615 (E.D. Cal. Aug. 31, 2006) ....................5

11   *Global Telemedia Int'l, Inc. v. Doe 1*,
   132 F. Supp. 2d 1261 (C.D. Cal. 2001)...........................................................................10

12

13   *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*,
   140 Cal. App. 4th 515 (2006).....................................................................................8, 9

14   *Jurd v. Pacific Indem. Co.*,
15   57 Cal. 2d 699 (1962) .................................................................................................14

16   *Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ..............................................................................................14

17

18   *Makaeff v. Trump Univ., LLC*,
   715 F.3d 254 (2013)...............................................................................................10, 11

19

20   *New.Net, Inc. v. Lavasoft*,
   356 F. Supp. 2d 1090 (C.D. Cal. 2004)...........................................................................10

21   *Nicosia v. De Rooy*,
   72 F. Supp. 2d 1093 (N.D. Cal. 1999) .............................................................................9

22

23   *Nizam-Aldine v. City of Oakland*,
   47 Cal. App. 4th 364 (1996)..........................................................................................2

24   *Obsidian Fin. Group, LLC v. Cox*,
25   740 F.3d 1284 (9th Cir. 2014).......................................................................................10

26   *Roberts v. Los Angeles Cnty. Bar Ass'n*,
   105 Cal. App. 4th 604 (2003).........................................................................................11

27

28   *Smith v. Santa Rosa Democrat*,
   No. C 11–02411 SI, 2011 WL 5006463 (N.D. Cal. Oct. 20, 2011)......................................5

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-CV-02560-JSW

*Stolz v. KSFM 102 FM*,
   30 Cal. App. 4th 199 (1994)............................................................................................12

*Tuck Beckstoffer Wines LLC v. Ultimate Distribs., Inc.*,
   682 F. Supp. 2d 1003 (N.D. Cal. 2010) ......................................................................11

**Statutes**

Cal. Code Civ. P. § 425.16.................................................................................................2

Cal. Code Civ. P. § 425.16(e)(3).......................................................................................8

Cal. Code Civ. P. § 425.16(e)(4).......................................................................................8

California's Unfair Competition Law ................................................................................15

**Other Authorities**

*The Facts About ADP & Zenefits*, www.adp.com/zenefits........................................................15

"Fear, uncertainty and doubt," Wikipedia, (July 4, 2015)
   https://en.wikipedia.org/wiki/Fear,_uncertainty_and_doubt ................................8

https://www.change.org/p/tell-unilever-to-stop-bullying-sustainable-food-
   companies (last visited July 6, 2015) ............................................................................9

P. Benson, "*Data Portability: It is about the Data—the Quality of the Data*,"
   MIT Information Quality Industry Symposium July 15-17, 2009 ...........................10

K. Zhu & Z. Zhou, "Lock-In Strategy in Software Competition: Open-Source
   Software vs. Proprietary Software," Information Systems
   Research……………................................................................................................10

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-CV-02560-JSW

1
2

### MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION AND SUMMARY OF ARGUMENT

3      ADP is a sixty-year-old data processing giant, who by some estimates processes one out

4    of every six paychecks in this country.  Zenefits is a two-year-old startup using a cloud-based

5    marketplace to automate human resources administration for small businesses.  When an old

6    economy giant fails to innovate, it has two choices.  It can let the marketplace decide, or it can

7    use outmoded and anticompetitive lock-in tactics to tie consumers to their data.  This case is an

8    example of the latter.  ADP—apparently feeling threatened by Zenefits—first shut off Zenefits'

9    access to data in ADP's small-business payroll system called ADP RUN, and then when Zenefits

10   brought that practice to light, ADP filed this suit to shut Zenefits up about it.

11     For two years, Zenefits and ADP worked together under an ADP Partner Agreement.

12   Zenefits advertised ADP's services on its website, and referred numerous clients to its products.

13   ADP was so enamored of Zenefits that it co-located salespeople on Zenefits' premises.  Although

14   ADP had no formal technical program for integrating Zenefits and ADP RUN, Zenefits was able

15   to use ADP's secure client access to synchronize the data across both systems.  Zenefits used its

16   technical innovation to take the pain out of human resources administration for the parties'

17   mutual clients.

18     On June 4, after a week of back-alley whispering that Zenefits had security problems,

19   ADP suddenly shut off Zenefits access to their mutual clients' data in ADP RUN.  The next day

20   ADP sent out a communications blast to clients accusing Zenefits of having security issues.

21   Despite the parties' two-year relationship, ADP did not warn Zenefits or give it an opportunity to

22   address any concerns.  ADP did not consult with their mutual clients to get permission before the

23   shutoff.  ADP refused to talk about the issues after the shutoff.  All the while ADP engaged in this

24   aggressive and mysterious behavior, Zenefits knew that it had used the very same secure system

25   as every client used to access the ADP RUN data—there was no security issue.  The logical

26   conclusion was that ADP was trying to harm a nascent competitor by tying clients to their data.

27     Zenefits went to the public to protest ADP's tactics.  Zenefits brought the debate about

28   using data lock-in to foreclose competition to social media and traditional media.  ADP responded

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 1 -

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-CV-02560-JSW

by posting its own side of the story on its website, declaring that it would "let the marketplace decide" who was right.  The public battle was joined on the parties' websites, in emails distributing a Petition at Change.org, and on Twitter.  Their many mutual clients—indeed small business and individual consumers everywhere—had an opportunity to consider the fundamental question of who should control their data.

The marketplace must not have liked ADP's arguments, because a scant few days later ADP abandoned its "let the marketplace decide" approach and filed this lawsuit.  When it couldn't win the public battle, ADP ran into Court to try to silence Zenefits (and its CEO, Parker Conrad) and stop them from presenting their arguments.  Fortunately, California has a tool for disposing of spurious lawsuits designed to silence public debate.  The Anti-SLAPP Special Motion to Strike under California Code of Civil Procedure Section 425.16 is designed to rid the Court of exactly this type of lawsuit.

As the substance and public reaction reveal, this is a public battle on an issue of major concern, and Section 425.16 therefore applies to the state law claims.  Part I, *infra*.  ADP's First Claim for Defamation should be stricken because it is premised upon protected non-actionable opinions, and to the extent Zenefits and its CEO made any assertions of fact *they were true*.  Part II(A), *infra*.  ADP's Second Claim for Intentional Interference rests on its defamation theory, and is likewise defective.  Part II(B), *infra*.  ADP's Third Claim for Unfair Competition is a model of irony, as ADP's efforts to lock-out competitors can hardly be the basis for a claim by it against Zenefits.  Part II(C), *infra*.  ADP gets no do-over here, the Court should strike these claims with prejudice and send ADP back to the marketplace where it belongs. Part III, *infra*.

For the reasons set forth herein, the Court should grant this Special Motion to Strike the First through Third Claims for Relief of ADP's Complaint.

## STATEMENT OF FACTS

**A.**     <u>**Zenefits Is A Cloud-Based Marketplace Offering Human Resources Automation And Efficient Services For Small Businesses.**</u>

Zenefits is a cloud-based human resources administration platform that makes it easier and more cost effective for businesses to manage employee records and information.  Among

1  other services, Zenefits provides software designed to eliminate duplicative data entry work by

2  serving as the single system of record for employee information.  Zenefits' software eliminates

3  the need to enter employee data multiple times in multiple places by automatically updating

4  various records systems with the latest information.   For example, when an employee changes

5  her address, the employee need only enter the data once in the Zenefits platform, and  Zenefits

6  takes care of the rest by automatically propagating that change across health insurance, 401k,

7  payroll and any other relevant systems.  Declaration of Jeffrey Hazard ("Hazard Decl.") ¶¶3, 4.

8           Zenefits' success comes from an innovative product combined with a creative "hub and

9  spoke" business model.  Employee records stored in the Zenefits cloud-based platform are the

10  "hub."  Hazard Decl. ¶3.  The spokes are various human resources applications built by Zenefits

11  and/or third parties that hook into the data stored in the hub.  *Id.*. Zenefits is building a

12  marketplace around the employee record.  *Id.*  Zenefits' first applications and services were based

13  on insurance benefits administration. Its current suite of applications includes its HR Cloud

14  Platform, Reports and Analytics, Employee Onboarding, Vacation and Paid Time Off, Time and

15  Attendance, and Stock Options Tracking solutions.  *Id.* ¶4.  Zenefits also offers a number of

16  related services, either directly or through relationships with third party partners, including

17  Payroll and Taxes, Insurance, Employee Benefits, Compliance, and HR Outsourcing.  *Id.* .

18  Payroll services are provided only through a variety of third parties.  Zenefits has written reseller

19  agreements with three of them—Intuit, ZenPayroll, and ADP.  Hazzard Decl. ¶11.

20           More than 10,000 clients use the Zenefits platform to manage HR operations for more

21  than 100,000 employees.   Hazard Decl. ¶5.  From its inception, Zenefits has targeted small

22  businesses and they are an especially important part of its strategy and business success.  *Id.*

23  Over 97% of Zenefits clients have fewer than 50 employees. *Id.*

24           **B.      Zenefits Begins Synchronizing Customer Data With ADP In 2013**

25           Zenefits performs data synchronization activity with several payroll providers including

26  ADP.  Morrison Decl. ¶3.   ADP is one of the world's largest business outsourcing providers.

27  Declaration of Robert L. Uriarte ("Uriarte Decl.") Ex. 8 at 8(2014 ADP 10-K).  With

28  approximately 367,000 clients in 125 countries, ADP boasts revenues in excessive of ten billion

1    dollars a year.  *Id.* at 3.  Many of Zenefits' clients use ADP products, including ADP RUN(for

2    small businesses) and ADP Workforce Now (for midsize businesses).  ADP RUN is managed by

3    ADP's Small Business Services business unit, while ADP Workforce Now is managed by ADP's

4    Major Accounts business unit.  Hazzard Decl. ¶8, 9.

5            Zenefits has been helping clients synchronize data among their various HR accounts,

6    including payroll accounts, since Zenefits' inception in 2013.  Declaration of Glynn Morrison

7    ("Morrison Decl.") ¶3.  In order to synchronize data between a Zenefits account and an ADP

8    payroll account, the client first gives Zenefits administrative credentials to the client's ADP

9    account.  Morrison Decl. ¶3.  Indeed, ADP's RUN agreements expressly contemplate that clients

10   will provide accountants or "other third parties" access to their RUN accounts.  Declaration of

11   Laura Kreitler ("Kreitler Decl."), Ex. 1 ¶5.  After receiving administrative credentials, Zenefits

12   maintains the congruence of the data in the systems via automated as well as manual processes.

13   Morrison Decl. ¶3.

14           Some companies provide application programming interfaces ("APIs") to enable third

15   parties to communicate effectively with their systems.  Since ADP did not have any suitable

16   published APIs, Zenefits engineers had to design their own code to synchronize the data.

17   Morrison Decl. ¶5.  The only difference between the way a client makes such changes herself

18   directly in ADP RUN and the way Zenefits does it is that a client makes manual changes online to

19   each record one at a time, while Zenefits automates the process.  *Id.* ¶4.  Zenefits used automated

20   synchronization with ADP RUN from May 2013 to June 4, 2015 without incident.  Morrison

21   Decl. ¶10.  ADP has been aware that Zenefits was syncing mutual clients' data since at least

22   sometime in 2014.  Hazard Decl. ¶7.  In that time, ADP has not used widely available

23   technological means for preventing this type of automated access.  Morrison Decl. ¶7.

24           ADP, not Zenefits, controls the security of a client connection to the ADP system—

25   whether a manual connection or an automated one.  Morrison Decl. ¶8.  ADP specifies the type of

26   connection and the type of encryption is used every time a client logs in to her ADP payroll

27   account over the Internet.  Morrison Decl. ¶8. Thus, when Zenefits' synchronization program

28   connects to a client's ADP payroll account, the synchronization program uses the exact same

1   secure connection that a human employee or third party acting on behalf of a client would use.

2   Morrison Decl. ¶9.

3   **C.     The Zenefits-ADP Partner Agreement and Close Working Relationship**

4         The Zenefits-ADP partnership has been close, valuable and lengthy.  Soon after Zenefits

5   created its synchronization solution for ADP clients, Zenefits and ADP began discussing a

6   referral and revenue sharing agreement. In January 2014, ADP and Zenefits memorialized their

7   partnership in a written contract ("Partner Agreement"). Hazard Decl. Ex. 1.  ADP also granted a

8   trademark license to provide ADP-related product descriptions for the Zenefits' website.  *Id.*

9   Pursuant to the Partner Agreement, Zenefits recommends ADP products to Zenefits clients, and if

10   they decide to sign up then Zenefits receives a commission.  Zenefits has similar reseller

11   relationships with other payroll providers including Intuit and ZenPayroll, and has advertised the

12   services of all three on its website.  Hazard Decl. ¶11.

13         Zenefits has referred numerous clients under the Partner Agreement, and ADP has

14   compensated—and continues to compensate—Zenefits for these referrals.  Hazard Decl. ¶11.

15   There have been multiple ADP employees embedded at Zenefits, and Zenefits personnel regularly

16   communicated with ADP personnel regarding a wide variety of sales and client-related issues.

17   Hazard Decl. ¶12.  Up until June 2015, there were multiple conversations between VP-level (and

18   higher) employees at ADP and Zenefits regarding tighter integration between the companies.

19   Hazard Decl. ¶¶13-15.  Despite the ongoing communication, ADP provided no warning or

20   attempt to solve any concerns before shutting off data syncing with ADP RUN.

21         Belying any legitimate security concerns, ADP Major Accounts division has not shut

22   down Zenefits' synchronization with the ADP Workforce Now product.   Morrison Decl. ¶13.

23   **D.     ADP Begins FUDding Zenefits Without Warning or Explanation**

24         ADP now claims that it turned off Zenefits' access to ADP RUN because synchronization

25   activity on June 3 and 4, 2015 looked to it like a denial of service attack.  Complaint

26   Dkt. 1("Compl.") ¶24; Uriarte Decl. Ex. 4 at 2.  This allegation is inconsistent with ADP's

27   conduct *before* June 3, 2015.  ADP first began causing trouble on or about May 28, 2015, when

28   an ADP customer support representative told a Zenefits client that ADP planned to sue Zenefits

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 5 -

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-CV-02560-JSW

1   for unspecified reasons.  Kreitler Decl. ¶6.  Upon hearing this story, Zenefits' payroll team was

2   understandably confused—as far as Zenefits was aware, the partnership was fine.  Kreitler Decl.

3   ¶7.  Later that day, an ADP representative told Laura Kreitler, a Zenefits employee with a

4   separate family business using ADP RUN, that her business should not use Zenefits because of

5   "security risks."  Kreitler Decl. ¶7.   On June 1, another ADP representative made similar

6   statements to a different Zenefits client.  Kreitler Decl. ¶8.

7          Although ADP purportedly had "security" concerns as of at least May 28, ADP did not

8   raise them with Zenefits.  Hazard Decl. ¶18.  Instead, ADP continued to secretly escalate its

9   attacks with the common clients.  Remarkably, during the very same week in which ADP was

10  escalating its shadow campaign against Zenefits, the embedded ADP representative, Jordan

11  Terpstra, told Zenefits that ADP was building out a team to support ADP-Zenefits integration.

12  Kreitler Decl. ¶10.

13         On June 4, 2015, an ADP representative told a Zenefits client that ADP would be turning

14  off the client's payroll service because the client was suing Zenefits.  Kreitler Decl. 13.  Later that

15  day, another ADP representative told the client that "[ADP] cannot let clients work with Zenefits"

16  due to an "executive directive" issued the prior week.  *Id*.  On June 5, Zenefits confirmed that

17  ADP  had disabled all ADP RUN users with @zenefits.com administrator accounts, locking out

18  approximately 700 small businesses.  Kreitler Decl. ¶17.  ADP provided no warning to clients or

19  to Zenefits about this action, despite regular lines of communication between Zenefits and high

20  level employees of ADP.  Hazard Decl. ¶18.  ADP claims in its Complaint that the reason for the

21  shut off was a data "spike" akin to a denial of service attack.  Compl. ¶24.

22         **E.     After Starting A Public Battle And Declaring It Would "Let The Marketplace**
           **Decide," ADP Then Tries to Silence Zenefits Through Legal Action.**

23

24         After shutting off the data on June 4, ADP sent a "communication" to the Zenefits-ADP

25  RUN mutual clients alleging that Zenefits was creating security issues for clients' data.  Compl.

26  ¶23; Request for Judicial Notice ("RJN") Ex. 4.  Remarkably, ADP now claims that the shutoff

27  was "not related" to this supposed concern.  Compl. ¶33.  At the same time, ADP was refusing to

28  meet with or talk to Zenefits about the situation.  Morrison Decl. ¶11.  Zenefits' CEO Parker

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-cv-02560-JSW

1    Conrad then responded to ADP's entire course of conduct with a Petition at Change.org and an

2    email message spreading that Petition and setting forth Zenefits' arguments.  RJN Exs. 1, 2.  Mr.

3    Conrad's email and the Petition argued Zenefits' position that ADP's "security concerns" were a

4    mere pretext for the shut down, and that ADP's conduct was motivated by an anti-competitive

5    desire to slow Zenefits down in advance of ADP's launch of its own competing platform.  Mr.

6    Conrad was hardly the first person to identify the potential for ADP to wield client data against its

7    competitors.  Market analysts have long identified ADP's potential to benefit from data lock-in.[1]

8    The Petition asked ADP CEO Carlos Rodriguez to restore Zenefits' authorized client access to

9    ADP RUN.

10       ADP immediately responded with an argument on its own website, seeking to rebut

11    Zenefits' point-by-point.  Uriarte Decl. Ex. 8.  ADP declared that it would "let the marketplace

12    decide."  *Id.*  The battle erupted across social and traditional media, with a Twitter hashtag

13    #ADPeeved and articles in a variety of media outlets.  Uriarte Decl. ¶14; *see* Compl. ¶43.  After

14    days of public debate that started when ADP sent its first mass email on June 4, ADP sued

15    Zenefits and its CEO on June 9.  Dkt. No. 1.

16       Remarkably, the very same day that ADP filed its lawsuit alleging defamation because

17    Zenefits called ADP "anticompetitive," an email from an ADP Small Business Service Manager

18    admitted the premise of Zenefits' argument, by promoting ADP's impending launch of a new

19    product designed to compete with Zenefits.  Kreitler Decl. Ex. 5.  The email reads:

20       Hope all is doing well, we are coming out with a product to compete with
     Zenefits, a full service integrated online payroll and benefits solution.  It's called
21       Opum, I have attached a copy of some information and screen shots of it.  Take a
     look at it and let's meet, it's a free solution as well.  Would be much easier to
22       change benefits than payroll, get the best technology of both worlds ☺

23

24    *Id*.  The email attached a brochure outlining services similar to that offered by Zenefits.

25       Meanwhile, ADP representatives continued to reach out to clients to sow fear, uncertainty,

26    and doubt ("FUD"), a well-known tactic used to disadvantage a competitor by disseminating

27

28    _____
     [1]*See* Uriarte Decl. Ex. 9 (Morningstar Report).

negative or false information.[2]  ADP made outrageously false claims, including the assertion that social security numbers were "floating out on the Internet."  Kreitler Decl. Ex. 4.  When Zenefits responded to the shut off by offering to provide manual support to clients, ADP tried to take over even *manual* payroll synchronization in order to get Zenefits out of the accounts.  Kreitler Decl. ¶18.  Underscoring ADP's lack of any real concern with security, Zenefits continues to synchronize with the ADP Workforce Now product.  Morrison Decl. ¶13.

## ARGUMENT

### I.    ADP'S CLAIMS ARE A DIRECT ASSAULT ON SPEECH IN A PUBLIC FORUM ABOUT AN ISSUE OF PUBLIC CONCERN.

SLAPP refers to the longstanding practice of big business using lawsuits to shut down public debate about its conduct—Strategic Lawsuits Against Public Participation.  ADP's defamation lawsuit against Zenefits, a much smaller company, and against its CEO Parker Conrad personally, is just the sort of SLAPP that California's anti-SLAPP statute was intended to protect.  The California statute protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  Cal. Code Civ. P. § 425.16(e)(3), (4).  Defendants' challenged statements qualify because, as explained below, they constitute speech in a public forum, and as described herein, they were made in connection with an issue of public interest—how giant old economy companies try to use data lock-in to preclude competition from new economy entrants.

### A.    The Challenged Statements Were Made In A "Public Forum."

A public forum is a place open to the public where information is freely exchanged.  *See Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 475 (2000).  It does not have to be a physical setting, and can include "other forms of public communication."  *Id.* at 476; *see also Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515, 520 (2006).

---

[2] *See* "Fear, uncertainty and doubt," Wikipedia, available at < https://en.wikipedia.org/wiki/Fear,_uncertainty_and_doubt>, last checked on July 4, 2015.

1   "Websites accessible to the public … are public forums for purposes of the anti-SLAPP statute."

2   *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006).

3      Two communications form the basis of ADP's first through third claims:  (1) a public

4   petition posted on the website Change.org (the "Change.org Petition"); and (2) an email

5   distributing and repeating the arguments of the Petition (the "June 5 Email").  Each easily

6   satisfies the "public forum" standard.  Indeed, ADP conceded as much when it complained that

7   Zenefits had impugned its motives "in a public forum."  *See* Uriarte Decl. Ex. 8.

8      The website Change.org allows petitioners like Zenefits to "mobilize hundreds of others

9   locally or hundreds of thousands around the world, making governments and companies more

10  responsive and accountable."[3]  Zenefits' Petition urged ADP to reverse its decision to block

11  Zenefits access to ADP RUN.  As of June 7, the Petition had garnered 550 supporters (today that

12  number is more than 2,200) and generated numerous written comments.  RJN Ex. 2.  This is

13  plainly a "public forum."  *Barrett*, 40 Cal. 4th at 41 n.4.[4]

14     The June 5 Email refers to and incorporates the Petition by reference, and therefore must

15  be read in context with it as part of a public exchange.  *See Nicosia v. De Rooy*, 72 F. Supp. 2d

16  1093, 1103 (N.D. Cal. 1999).  Indeed, the mass e-mail qualifies independently of the Petition

17  because it is an email sent to all Zenefits clients who are also ADP RUN clients, about 850

18  recipients. Compl. ¶17; *see Integrated Healthcare Holdings, Inc.*, 140 Cal. App. 4th at 520 (email

19  to medical executive committee protectable under anti-SLAPP statute); *Damon*, 85 Cal. App. 4th

20  at 476 (newsletter to 3,000 recipients equals "public forum").

21  **B.    The Challenged Statements Directly Concern The Public Interest In
        Preventing ADP's Data Lock-in.**

22

23     The statements at issue here directly concern a matter of public interest, data lock-in.  In

24  the anti-SLAPP context, "public interest" has been "broadly construed to include not only

25  governmental matters, but also private conduct that impacts a broad segment of society and/or

26  _____

    [3] https://www.change.org/about (last visited July 6, 2015)

27  [4] Zenefits is not the first startup to use Change.org to fight back against questionable tactics by
    dominant market players.  *See. e.g.,* https://www.change.org/p/tell-unilever-to-stop-bullying-

28  sustainable-food-companies (last visited July 6, 2015).

1   that affects a community in a manner similar to that of a governmental entity." *Damon*, 85 Cal.

2   App. 4th at 479.  Private actions fall within this definition "especially when a large, powerful

3   organization may impact the lives of many individuals." *Id.* (citation omitted).  In light of ADP's

4   market might and vast number of small business customers (Uriarte Decl. Ex. 7; Compl. ¶14), its

5   actions and statements towards Zenefits fall squarely within the zone of public interest—

6   especially for the ten thousand small businesses and more than 100,000 employees that rely on

7   Zenefits HR software.  *Id.*; *see also Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261,

8   1265 (C.D. Cal. 2001).

9        Zenefits utilized a public forum to voice its opinion, and to warn customers, that in its

10   view ADP had acted improperly, unethically, and anti-competitively, to the detriment of small

11   businesses (and their customers and employees) across the country.  *See Makaeff v. Trump Univ.,*

12   *LLC,* 715 F.3d 254 (2013)*, Obsidian Fin. Group, LLC v. Cox,* 740 F.3d 1284, 1291-92 (9th Cir.

13   2014)*.*  Zenefits' Petition speaks directly to the issue of how large old economy companies with

14   masses of client data are able to frustrate choice and lock out new entrants by preventing access to

15   that data.  Such business tactics hurt everyone, not just Zenefits.  One of the great virtues of 21st

16   century open software and open platforms is the ability to create marketplaces that increase

17   competition, lower costs, and facilitate a broadly more productive economy.[5]

18        Old economy companies have often responded slowly to such innovation, and try to

19   prevent encroachment by locking down their customers.  This is an issue of broad interest to all

20   types of consumers and small businesses, and it is therefore no coincidence that over 2,200

21   supporters joined Zenefits' cause, some of whom posted their own opinions on the Change.org

22   Petition page.  This is exactly the sort of speech that addresses a matter of public interest.  *See*

23   *also New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1106 (C.D. Cal. 2004) (third party

24   discussions on websites evinced public interest).

25        ADP's Complaint confirms the public interest this dispute has generated:

26

27   _____

[5] *See, e.g.,* Uriarte Decl. Ex. 11, K. Zhu & Z. Zhou, "Lock-In Strategy in Software Competition: Open-Source Software vs. Proprietary Software," Information Systems Research; P. Benson; Ex. 10, "Data Portability:  It is about the Data—the Quality of the Data," MIT Information Quality Industry Symposium July 15-17, 2009.

28

The "petition" and some of the negative comments have also been **more broadly distributed through other social media channels**, including via Twitter and Facebook. This has, in turn, generated an **increasing volume of discussion on blogs and digital media forums** that have perpetuated Zenefits' false accusations against ADP and generated further negative attacks on ADP's reputation, all premised on the false and misleading statements made by Defendants …. The petition has also generated attention from mainstream news outlets …

Compl. ¶43 (emphasis added). The attention from large media outlets and the social media commentariat confirm that the statements at issue concern a matter of widespread public interest and are protected by California's anti-SLAPP statute.[6]

## II.   ADP CANNOT SHOW A PROBABILITY OF SUCCEEDING ON ITS CLAIMS.

Because Zenefits' statements fall within the protection of the anti-SLAPP statute, "[t]he burden then shifts to [ADP] to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal." *Makaeff*, 715 F.3d at 261. Under the "reasonable probability" standard, ADP's claims should be dismissed either if they lack a sufficient legal basis or if ADP cannot present facts that would lead a reasonable jury to find for it. *Id.* (citation omitted). ADP cannot simply rely on its pleadings but must come forward with competent, admissible evidence, to support its claims. *Roberts v. Los Angeles Cnty. Bar Ass'n*, 105 Cal. App. 4th 604, 614, (2003). The Court should grant Zenefits' motion "if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." *Tuck Beckstoffer Wines LLC v. Ultimate Distribs., Inc.*, 682 F. Supp. 2d 1003, 1009 (N.D. Cal. 2010).

### A.   ADP's First Claim For Defamation Fails Because Zenefits' Statements Are Non-Actionable Opinion.

As described in detail in the accompanying Motion to Dismiss, Zenefits' statements challenged in the Complaint are non-actionable opinion because the general tenor of the work, colorful language and Zenefits' surmise as to ADP's subjective motives are exactly the kind of argument that is protected by the First Amendment. Defendants' Motion to Dismiss at 10-11.

Considering additional evidence only further confirms this conclusion. The Change.org website makes clear that "[p]etitions and campaigns on Change.org **represent the many opinions**

---

[6] *See, e.g.*, Uriarte Decl. Exs. 2-6.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 11 -

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-cv-02560-JSW

of millions of people" and that users are merely posting "*views*, *opinions*, recommendations, or advice." Uriarte Decl. Ex. 1, Change.org Terms of Service (emphasis added). ADP started the debate with a mass e-mail, and then responded to the Petition on its website. *See* Uriarte Decl. Ex. 8, "The Facts about ADP & Zenefits: Response to the claims made by Zenefits." As ADP put it, "let the marketplace decide" is precisely the goal of the First Amendment in a public debate. The only mystery is why ADP decided to resort to a lawsuit instead of continued debate—apparently it was losing the argument and with it, customers. That is the worst possible reason for these claims, and one the First Amendment most abhors.

### B.  The Defamation Claim Also Fails Because Any Factual Assertions Are True.

The context, tenor, and language of Zenefits' statements render them non-actionable, and ADP should have left it for the marketplace to judge both sides of this important argument about data portability and customer choice. Having brought the argument to this Court, however, ADP must now put up or shut up. The fact of the matter is that Zenefits' had substantial reason to believe that its assertions of ADP's motive were true. Indeed, in a remarkable turn of events, on the very day that ADP filed this lawsuit, ADP sent an email confirming Zenefits' belief that ADP would soon release a "free product to compete with Zenefits." Kreitler Decl. Ex. 5.

Thus, the evidence clearly favors Zenefits. ADP spent at least a week FUDing about Zenefits' security among their mutual clients then denied security was the reason for the shut off and instead offered the "spike" as its reason. Zenefits knew this at the time its CEO made the challenged statements, and these facts clearly support a reasonable (if not inescapable) inference of pretext as argued in the Petition and June 5 Email. Ironically, ADP then confirmed Zenefits' surmise as to its true motive by informing at least one client of the competitive product coming on the day it filed the Complaint. ADP *did* FUD Zenefits about security, security *was* a pretext for its actions, and a competitive product *is* coming (or at least ADP's sales managers think so).

Thus, even if one reads any of the Zenefits statements as implied assertions of fact, ADP cannot carry its burden of proving such assertions false. *See Nizam-Aldine v. City of Oakland*, 47 Cal. App. 4th 364, 375 (1996) (plaintiff bears burden of proving falsity of statements on matters of public interest); *Stolz v. KSFM 102 FM*, 30 Cal. App. 4th 199, 202 (1994) (public figure must

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 12 -

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-CV-02560-JSW

show the falsity of the statements at issue in order to prevail in a suit for defamation) (citation omitted).  Literal truth is not required to defeat a defamation claim, so long as the statement is "substantially true" based on the "gist" of the remark.  *Id.*  For the following reasons, the only portions of Zenefits' statements that are even arguably factual are, at a minimum, "substantially true."  *See id.*

   **Zenefits "has partnered with ADP."**  Zenefits stated that it has "partnered with ADP amicably since we were founded."  That is true.  ADP began synchronizing data with ADP in early 2013, Morrison Decl. ¶2-3, and Zenefits entered into an "ADP Partner Agreement" with Zenefits as of January 30, 2014,  Hazard Decl. Ex. 1.  ADP calls Zenefits' statement "misleading," asserting that Zenefits has not partnered with ADP in connection with ADP RUN.  Compl. ¶38.  But the "Partner Agreement"—ADP's title, not Zenefits'—says on its face that ADP Run is one of the available services thereunder.  With ADP salespeople co-located at Zenefits, any reasonable person would understand it to be an amicable partnership.

   **"[A]n ADP client can set up anyone in the world to administer their payroll – except those with a Zenefits email account -- … ."**  ADP alleges that this statement is false because "ADP's protective measures did not prevent any ADP payroll customer from administering its payroll in any manner."  Compl. ¶40.  But ADP admits that it blocked Zenefits.  *Id.* ¶¶25, 33.  A client can administer her own account, or apparently still use others to do it, just not Zenefits.  It is pure sophistry by ADP to assert that a client could *itself* still administer payroll directly and that makes Zenefits statement false.

   **ADP Blocked Zenefits "Without Permission."**  Zenefits argued to its clients that ADP blocked Zenefits' access to ADP RUN "without *your* permission."  RJN Ex. 1 & 2.  That is true.  ADP neither requested nor received permission to block Zenefits' access to ADP RUN from the customers who had authorized Zenefits to access ADP RUN on their behalf.  ADP does not allege otherwise.  Rather, ADP sets up a straw man by rewriting Zenefits statement as "ADP lacks *the legal authorization* to block accounts for certain reasons."  The audience here was the general public, not a bunch of lawyers.  When a child fails to get permission, parents know that means she didn't ask for consent *to do that particular thing*.  The "gist" of Zenefits' statement was plain:

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 13 -

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-CV-02560-JSW

1    ADP never asked clients specifically whether it was okay with them for it to disable the accounts

2    in which they named Zenefits an administrator.  The California Supreme Court has in other

3    contexts drawn precisely this distinction between "legal permission" and "actual permission as a

4    factual issue."  *See Jurd v. Pacific Indem. Co.*, 57 Cal. 2d 699, 705 (1962).  That distinction is

5    applicable here as a matter of common sense, and this statement easily satisfies the "substantially

6    true" standard based on the "gist" it conveyed.  *See Hughes*, 122 Cal. App. 4th 931, 937 (2004).

7         ***"ADP is claiming that they are taking this action for 'security' reasons – but this is***

8    ***clearly not true."***  There are two potential assertions in this statement:  (1) ADP is claiming that

9    they blocked Zenefits for security reasons, and (2) the security reasons were a pretext.  Both

10   potential assertions are true.  Taking the second one first, ADP plainly admits in its Complaint

11   that its action in shutting Zenefits off was solely because of the so-called "spike" and was " not

12   related" to its purported security concerns.  Compl. ¶33.

13        So the only question is whether ADP ever claimed it blocked Zenefits for security reasons.

14   The evidence is clear from clients that it did.  Kreitler Decl. ¶3 & 4.  Indeed, even in its public

15   rebuttal (the one where it said it would let the marketplace decide), ADP claimed that it blocked

16   Zenefits' access because Zenefits "was pulling sensitive information … in a manner that ***did not***

17   ***comply with ADP's standards for security.***"  RJN Ex. 4 (emphasis added); *see also* Uriarte Decl.

18   Ex. 8, The Facts About ADP & Zenefits, www.adp.com/zenefits ("Late in the day on June 5,

19   Zenefits approached ADP to resolve the security and technical issues that required ADP to block

20   Zenefits from the ADP RUN platform.").

21        **C.    ADP Cannot Show The Independently Wrongful Conduct Necessary To**
          **Sustain Its Second Claim For Relief For Intentional Interference.**
22

23        ADP's claim for intentional interference with prospective economic relations depends on

24   its defamation claim and fails for the same reasons.  To prevail on an intentional interference

25   claim, ADP must establish that Zenefits' conduct was "wrongful by some legal measure other

26   than the fact of interference itself."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

27   1134, 1153 (2003).  Under settled California law, an act is "wrongful" only "if it is proscribed by

28   some constitutional, statutory, regulatory, common law, or other determinable legal standard."

*Id.* at 1159.  ADP alleges only that Zenefits engaged in the "wrongful acts" of publishing the allegedly defamatory June 5 email and the Change.org petition, which "interfere[d] with ADP's relationships with its customers."  *See* Compl. ¶¶30, 36, 37 (describing these two allegedly wrongful acts).  As demonstrated in Part A, *infra*, nothing about these communications is defamatory.  Because ADP's defamation claim must be stricken, its derivative intentional interference claim likewise must be stricken.

### D.   ADP Cannot Show That Zenefits' Statements Resulted in Unlawful, Fraudulent, or Anti-Competitive Acts Or Practices.

The standards for evaluating a claim under California's Unfair Competition Law are set out in greater detail in Defendants' Motion to Dismiss.  For the same reasons ADP cannot plead any viable UCL claim, ADP cannot prove one.  Ironically, ADP's claim for "unfair" business practices requires it to prove that conduct by Zenefits "threaten[ed] an incipient violation of an antitrust law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 187 (1999).  If anyone is a dominant competitor unlawfully refusing to deal here, it is surely the payroll giant trying to lock clients into a single choice and prevent them from using Zenefits.  Nor could ADP prove a "fraudulent" or "unlawful" business practice by Zenefits, for all of the reasons described in Part A, *infra*.  Zenefits' statements were non-actionable opinion or were true.

## III.   THE CLAIMS SHOULD BE STRICKEN WITH PREJUDICE.

ADP should not be given leave to re-plead its claims for defamation, intentional interference with prospective economic advantage, or unfair competition.  Because the purpose of the anti-SLAPP statute is "to provide for a speedy resolution of claims which impinge on speech protected by the First Amendment … leave to amend is not necessary or appropriate." *Smith v. Santa Rosa Democrat,* No. C 11–02411 SI, 2011 WL 5006463, at *7 (N.D. Cal. Oct. 20, 2011). *See also Flores v. Emerich & Fike,* No. 1:05–CV–0291 OWW DLB, 2006 WL 2536615, at *10 (E.D. Cal. Aug. 31, 2006) ("To allow amendment after an anti-SLAPP motion to strike has been granted eviscerates the purpose of the anti-SLAPP statute.").

## CONCLUSION

ADP's first through third claims for relief should be stricken with prejudice.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 15 -

DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE
CASE NO. 4:15-cv-02560-JSW

1

2     Dated: July 6, 2015                              ANNETTE L. HURST
                                                       SCOTT LONARDO
3                                                      ROBERT L. URIARTE
                                                       Orrick, Herrington & Sutcliffe LLP

4

5                                                      By:  _/s/ Annette L. Hurst_____
                                                            ANNETTE L. HURST
6                                                           Attorneys for Defendants ZENEFITS and
                                                            PARKER CONRAD
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Orrick, Herrington &
Sutcliffe LLP
Attorneys at Law
San Francisco

- 16 -

Defendants' Anti-SLAPP Motion To Strike
Case No. 4:15-cv-02560-JSW