MORGAN, LEWIS & BOCKIUS LLP
Robert A. Lewis (SBN 83630)
robert.lewis@morganlewis.com
Frank Kennamer (SBN 157844)
frank.kennamer@morganlewis.com
Geoffrey T. Holtz (SBN 191370)
geoffrey.holtz@morganlewis.com
Kristen A. Palumbo (SBN 215857)
kristen.palumbo@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone:  (415) 442-1000
Facsimile:  (415) 442-1001

Attorneys for Plaintiff
ADP, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADP, LLC, a Delaware limited liability company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>YOURPEOPLE, INC., a Delaware corporation d/b/a/ Zenefits Insurance Services, and PARKER CONRAD, an individual,<br><br>                    Defendants. | No. 15-cv-02560-VC<br><br>**OPPOSITION TO ANTI-SLAPP SPECIAL MOTION TO STRIKE FIRST THROUGH THIRD CLAIMS FOR RELIEF**<br><br>Date:   August 20, 2015<br>Time:   10:00 a.m.<br>Place:  San Francisco Courthouse,<br>          Courtroom 4 – 17th Floor<br>Judge:  Hon. Vince Chhabria |

1

**TABLE OF CONTENTS**

2                                                                                                  **Page**

3   I.      INTRODUCTION ........................................................................................................ 1

4   II.     FACTUAL BACKGROUND ...................................................................................... 2

5           A.    The Facts Resulting in Denial of Access ........................................................ 2

6           B.    ADP's Security Concerns Regarding Zenefits ............................................... 4

7           C.    Defendants' Actions and This Lawsuit ........................................................... 4

8   III.    ARGUMENT .............................................................................................................. 5

9           A.    Defendants' Motion is Barred by the Commercial Speech Exemption to the
                  Anti-SLAPP Statute in Section 425.17(c) ...................................................... 5
10

11          B.    Defendants Fail to Meet Their Burden to Show That Their Statements
                  Were Made in Connection with an Issue of Public Interest and the "Public
                  Issue" They Propose to the Court Is a Fabrication ......................................... 9
12

            C.    ADP Easily Demonstrates a Probability of Prevailing on Its Claims ................ 13
13

14                1.    ADP Demonstrates a Probability of Prevailing on Its Claim for
                        Defamation .......................................................................................... 13

15                      a.      Defendants' Statements Are of Fact, Not Opinion ...................... 13

16                      b.      Defendants' Representations Were Not True ............................... 14

17                2.    ADP Demonstrates a Probability of Prevailing on Its Claim for
                        Intentional Interference ...................................................................... 14
18

19                3.    ADP Demonstrates a Probability of Prevailing on Its Unfair
                        Competition Law Claim ....................................................................... 15

20          D.    ADP Is Entitled to Its Costs and Reasonable Attorney's Fees Incurred in
                  Opposing This Frivolous Motion ................................................................... 15
21

22   IV.    CONCLUSION ......................................................................................................... 15

23

24

25

26

27

28

OPPOSITION TO ANTI-SLAPP SPECIAL MOTION TO STRIKE

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*All One God Faith, Inc. v. Organic & Sustainable Indus. Stds., Inc.*,

5

    183 Cal. App. 4th 1186 (2010) ................................................................ 12

6

*Demetriades v. Yelp, Inc.*,

    228 Cal. App. 4th 294 (2014) ....................................................... 7, 8, 13

7

*Doe v. Gangland Prods., Inc.*,

8

    730 F.3d 946 (9th Cir. 2013) .................................................................. 13

9

*Graham-Sult v. Clainos*,

10

    756 F.3d 724 (9th Cir. 2014) .................................................................. 13

11

*Korea Supply Co. v. Lockheed Martin Corp.*,

    29 Cal.4th 1134 (2003) ........................................................................... 14

12

*Sanders v. Walsh*,

13

    219 Cal. App. 4th 855 (2013) ................................................................. 14

14

*Sharper Image Corp. v. Target Corp.*,

15

    425 F. Supp. 2d 1056 (N.D. Cal. 2006) ................................................... 8

16

*Simpson Strong-Tie Co., Inc. v. Gore*,

    49 Cal.4th 12 (2010) ............................................................................ 6, 8

17

*Sunset Millennium Assocs., LLC v. LHO Grafton Hotel, L.P.*,

18

    146 Cal. App. 4th 300 (2006) ................................................................... 6

19

*Weiland Sliding Doors and Windows, Inc. v. Panda Windows and Doors, LLC*,

20

    814 F. Supp. 2d 1033 (S.D. Cal. 2011) .................................................... 8

21

*World Fin. Group, Inc. v. HBW Ins. & Fin. Svcs., Inc.*,

    172 Cal. App. 4th 1561 (2009) ........................................................ 11, 12

22

**STATUTES**

23

Cal. Code Civ. Proc.

24

    § 128.5 ..................................................................................................... 15

    § 425.16 ................................................................ 5, 9, 11, 12, 13, 15

25

    § 425.17 ............................................................. 2, 5, 6, 7, 8, 9, 13

26

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

**OTHER AUTHORITIES**

4

Fed. R. Evid.

5

    401..........................................................................................................................5

    602..........................................................................................................................5

6

    701..........................................................................................................................5

    801..........................................................................................................................5

7

    802..........................................................................................................................5

    805..........................................................................................................................5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO ANTI-SLAPP SPECIAL MOTION TO STRIKE

1

**I.      INTRODUCTION**

2          There are consequences for telling lies.  That is so even if you are a Bay Area startup,

3  sporting a $4.5 billion valuation and a couple of celebrity investors, or its brash CEO.

4          Defendants Zenefits and its CEO Parker Conrad lied about Plaintiff ADP and offered

5  money to ADP's clients to try to lure them away from ADP on the basis of those lies.  That

6  conduct is not merely unworthy of any responsible business or business executive, it is unlawful.

7  When Defendants refused ADP's demand to publicly retract their lies, ADP filed this lawsuit.

8          The facts are simple enough (although Defendants try to cloud them).  ADP is a

9  successful data processing company that has spent years earning its stellar reputation in the

10  marketplace.  Zenefits is a two-year-old human resources startup with some 10,000 small

11  business clients.  Approximately 700 ADP payroll clients are also Zenefits HR clients.  Instead of

12  approaching ADP, like other companies do, about obtaining access to joint client information in

13  ADP's product for small businesses called ADP RUN, Zenefits deployed its own automated

14  processes to enter RUN to obtain information to use in Zenefits' system.  Tellingly, the process

15  Zenefits used to access ADP's RUN system was a violation of Zenefits' own terms of service;

16  Zenefits prohibits its own clients from allowing such processes to be used on Zenefits' system.

17          But starting in late May 2015, Zenefits' automated process began to interfere with ADP's

18  RUN database, likely because Zenefits' process did not account for the major update of RUN that

19  ADP released in May.  ADP took temporary measures to avoid disruption of its RUN system, but

20  did not know then that Zenefits was the cause of the database interference.  When the RUN

21  database interference recurred on June 3, ADP determined that the cause was Zenefits' automated

22  processes and on June 4 denied Zenefits access to the RUN system to protect the RUN database

23  and prevent a service disruption to 84,000 RUN clients and perhaps the entire RUN system.

24          Infuriated by the denial of access, Defendants sent an email on June 5 from CEO Conrad

25  to the 700 joint Zenefits/ADP clients making numerous false statements about ADP and why it

26  had denied access to Zenefits.  Additionally, CEO Conrad offered ADP clients $1,000 to switch

27  from ADP to another payroll provider.  Zenefits also started a petition on the website change.org,

28  recycling some of the false statements from CEO Conrad's email, and again offering $1,000 to

1   ADP clients to leave ADP.

2       ADP's response was to send a letter to Zenefits on June 7 explaining the reason for the

3   restriction on Zenefits' access to the RUN system—the interference to the RUN database by

4   Zenefits' automated processes threatening a business disruption—and asking Defendants for a

5   public retraction.  When Defendants refused, ADP filed this lawsuit.

6       Now Defendants double-down on their conduct by bringing this motion.  Defendants

7   claim that their false statements about ADP were really an exercise of free speech on an important

8   public issue that is protected by California's anti-SLAPP statute.  To the contrary, this motion is a

9   clear abuse of that statute, for several reasons.  First, the facts in issue are squarely within the

10  "commercial speech" exemption to the anti-SLAPP statute in Section 425.17.  Second,

11  Defendants fail to meet their burden to show that their statements relate to a matter of "public

12  interest."  And for good reason, since those statements relate only to Defendants' complaint that

13  Zenefits' access to RUN was denied as to 700 clients.  Recognizing that this is a private

14  commercial dispute, Defendants fabricate a "public issue"—"data lock-in"—that has nothing to

15  do with the statements at issue and is no "public issue" in any event.  Finally, even if Defendants

16  had met their burden of proof, ADP easily establishes that its claims have a probability of

17  success, which also defeats Defendants' motion.

18      Defendants' motion should therefore be denied.  Defendants' motion is also frivolous, and

19  that entitles ADP to an award of reasonable attorney's fees and costs incurred in opposing it.

20  **II.    FACTUAL BACKGROUND**

21          **A.    The Facts Resulting in Denial of Access**

22      One service offered by ADP is a small business payroll solution called RUN Powered by

23  ADP® (RUN).  RUN permits a small business to conduct its payroll operations via a web

24  browser, mobile app or telephone and permits employees 24/7 access.  In May 2015, ADP

25  released a major update to the RUN user interface. (Richard Anderson Declaration "Anderson

26  Decl." ¶ 3)

27      On May 28, 2015, system performance monitors indicated an abnormal increase in RUN

28  server load as a result of an extreme volume of web requests from users later known to be

1  associated with Zenefits. ADP was required to take swift action to alleviate system pressure to

2  prevent possible disruption of service to all of its RUN clients. At that point ADP did not know

3  that Zenefits was responsible for the database interference. Zenefits had never contacted ADP to

4  advise it whether or how Zenefits intended to access information from RUN and never inquired

5  about developing an application programming interface (API) to allow it to obtain RUN

6  information safely and efficiently. Because Zenefits did not work with ADP to develop an API,

7  Zenefits was never integrated with RUN. (Anderson Decl. ¶¶ 5, 12-13)

8      On June 3 and June 4, 2015, ADP experienced a further significant and sudden increase in

9  remote access requests into RUN that again caused database interference, risked overloading and

10  crippling one of the RUN database clusters, and created a serious risk of significant disruption of

11  service. ADP repeated its actions to temporarily alleviate system pressure. On June 4, ADP

12  determined that Zenefits was the source of the interference, caused by the automated processes

13  Zenefits uses to read and write data from RUN for the approximately 700 joint clients of ADP

14  and Zenefits.[1] At points during June 3 and 4, Zenefits was responsible for up to 25 percent of the

15  total user requests in RUN, despite serving less than one quarter of one percent of the clients on

16  the RUN system. (Anderson Decl. ¶¶ 6-7)

17      On June 4, ADP blocked further requests from Zenefits to resolve the database

18  interference problem. Had ADP not taken this action when it did, it risked potential disruption of

19  service to the 84,000 RUN customers in the database cluster affected by Zenefits' automated

20  processes and also possible service disruption to the approximately 326,000 additional ADP RUN

21  clients. ADP's action was not influenced by the fact that Zenefits was responsible for the

22  database interference that threatened the service disruption; ADP would have taken the same

23  action irrespective of who created the conditions threatening a service disruption. The restriction

24  on Zenefits' access did not affect the ability of the joint clients to access RUN directly.

25  (Anderson Decl. ¶¶ 8-10) ADP's client contracts specify that ADP can deny access to the RUN

26  system in such circumstances without notice. (Shannon McGinness Declaration "McGinness

27  _____

28  [1]    Zenefits' Terms of Use Agreement (section E) prohibits the use of the very processes it
used against ADP RUN, recognizing their potential for mischief. (Anderson Decl. ¶ 16)

1    Decl." ¶ 4)

2          **B.    ADP's Security Concerns Regarding Zenefits**

3          Also in May, in connection with an increase in requests from RUN clients for

4    administrative log-in access for Zenefits personnel, ADP's Small Business Services (SBS)

5    business unit identified potential concerns with clients granting Zenefits administrative user

6    credentials to allow Zenefits access to clients' employee and company data in a manner that may

7    not meet ADP's security standards and allowing Zenefits to make changes requiring a payroll

8    administrative level access.[2]  Because of these concerns, the SBS business unit in late May

9    determined that it would not grant administrative access to new Zenefits users until an appropriate

10   third-party security review was completed regarding Zenefits and that clients who use Zenefits

11   should be informed about the potential security and data accuracy risks from administrative

12   access by Zenefits.  On June 3, the SBS business unit pre-loaded an email to ADP clients who use

13   Zenefits into ADP's client email communication tool for automated issuance on June 5.  The

14   email was drafted without knowledge of, or reference to, the database interference issues that

15   RUN was experiencing from Zenefits' automated access.  On June 5, 2015, ADP's

16   communication tool issued the communication, informing clients that "ADP will conduct a

17   security review of all Zenefits processes and user requests."  (McGinness Decl. ¶¶ 8-9 & Ex. B)

18         **C.    Defendants' Actions and This Lawsuit**

19         Late in the business day Eastern Time on June 5, Zenefits approached ADP regarding

20   ADP's actions terminating Zenefits access to RUN.  ADP's CEO offered to speak with the

21   Zenefits CEO.  Zenefits CEO Conrad sent an email at 5:16 p.m. EDT to joint Zenefits and ADP

22   clients containing the misrepresentations that are the subject of this lawsuit.  (Defendants' RJN

23   Ex. 1)  Zenefits CEO Conrad contacted ADP CEO Carlos Rodriquez by email at 8:36 p.m. EDT

24   on June 5, stating that he "perhaps reacted a bit too quickly," acknowledging that he "asked the

25   _____

26   [2]    ADP in February 2014 had entered into a Referral Partner Agreement with Zenefits, by
     which it would pay referral fees for new clients referred to ADP.  ADP has entered into this form
27   of agreement with hundreds of entities and, as a result, ADP routinely has employees spend time
     at the offices of the party to the agreement, as it did with Zenefits.  The agreement between ADP
28   and Zenefits has no relationship to Zenefits' access to information from ADP's RUN system.
     (McGinness Decl. ¶ 7)

1    team to take a really aggressive stance," and said "If this is a misunderstanding and we moved too

2    quickly on this, gosh I feel terrible about that."  On Sunday June 7, ADP's general counsel sent a

3    cease-and-desist letter by email to Zenefits' general counsel asking that Zenefits publicly retract

4    the statements made in its June 5 client email and in Zenefits' change.org "petition" (Defendants'

5    RJN Ex. 2) referenced in the June 5 email.  When Zenefits refused to publicly retract its

6    statements on June 8, ADP filed this lawsuit on June 9.  (David Kwon Declaration "Kwon Decl."

7    ¶¶ 3-6)[3]

8    **III.    ARGUMENT**

         **A.    Defendants' Motion is Barred by the Commercial Speech**
9               **Exemption to the Anti-SLAPP Statute in Section 425.17(c)**

10          Defendants strain, unsuccessfully as we establish in part B. below, to bring their

11   statements and conduct within the ambit of Code of Civil Procedure Section 425.16, the "anti-

12   SLAPP" statute.  Defendants fail even to mention the "commercial speech" exemption to the

13   "anti-SLAPP" statute in the companion statute, Section 425.17.  That's because the exemption in

14   Section 425.17 applies here and mandates denial of Defendants' motion.

15          Section 425.17 protects against the very abuse of the "anti-SLAPP" statute that

16   Defendants attempt here: "The Legislature finds and declares that there has been a disturbing

17   abuse of Section 425.16, the California Anti-SLAPP Law, which has undermined the exercise of

18   the constitutional rights of freedom of speech and petition for the redress of grievances, contrary

19   to the purpose and intent of Section 425.16."  Cal. Code Civ. Proc. § 425.17(a).  Section

20   425.17(c) establishes an express exemption for "commercial speech" that applies to the

21   statements and conduct alleged in ADP's complaint.  That section provides, in relevant part:

22              (c) **Section 425.16 does not apply to any cause of action brought**
                **against a person primarily engaged in the business of selling** or
23              leasing goods or **services**, including, but not limited to, insurance,
                securities, or financial instruments, **arising from any statement or**
24              **conduct by that person if both of the following conditions exist**:

25   _____

     [3]     While Defendants' declarations offer information not relevant to the issues raised by its
26   motion (Federal Rules of Evidence 401), ADP additionally makes these objections under Federal
     Rules of Evidence 602, 701, 801, 802, 805:  Kreitler Declaration ¶¶ 6-18 and Exhibits 2-5
27   (hearsay, lacks foundation); Hazard Declaration ¶ 14 (hearsay, lacks foundation, lay opinion), ¶¶
     15-19 (hearsay, lay opinion); Morrison Declaration ¶¶ 7, 8, 10-12 (lay opinion, lacks foundation).
28   The Court should disregard these statements in deciding Defendants' motion.

(1) **The statement or conduct consists of representations of fact about that person's or a business competitor's business operations**, goods**, or services**, that is **made for the purpose of obtaining approval for, promoting, or securing sales** or leases of, **or commercial transactions in, the person's** goods or **services**, **or the statement or conduct was made in the course of delivering the person's goods or services**.

(2) **The intended audience is an actual or potential buyer or customer**, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer ….

Cal. Code Civ. Proc. § 425.17(c) (emphases added).

Section 425.17(c) thus "enumerate[s] circumstances where the special motion to strike screening mechanism is unavailable." *Sunset Millennium Assocs., LLC v. LHO Grafton Hotel, L.P.*, 146 Cal. App. 4th 300, 312 (2006); *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal.4th 12, 30 (2010). Each of the requirements for the application of Section 425.17(c)'s exemption is satisfied here, as we demonstrate.

The predicate for application of Section 425.17(c) is satisfied. There is no dispute that Defendants are persons "primarily engaged in the business of selling … services." (*See* Defendants' Hazard Decl. ¶¶ 3-5) And the causes of action in ADP's complaint on their face arise from statements and conduct by the Defendants.

The first of the two necessary conditions is also satisfied. There can be no dispute that the statements and conduct at issue consist "of representations of fact about [Defendants] or [ADP's] business operations … or services." Indeed, Defendants' statements and conduct <u>are</u> fact representations about <u>both</u> Defendants' operations and services and ADP's operations and services.[4] Even a cursory review of the June 5 email that Zenefits CEO Conrad sent to joint clients of Zenefits and ADP establishes this. The email states numerous purported facts, including: that ADP without client permission systematically deactivated Zenefits admin user accounts in the ADP RUN payroll account; that ADP did this because it believes it can build software to compete with Zenefits and to impede Zenefits; that ADP's security concerns about Zenefits are "clearly not true"; that what Zenefits does is no different from what ADP permits bookkeepers or accountants to do; that Zenefits "is still completely compatible with ADP

---

[4]     Zenefits is an ADP competitor in some product lines. (McGinness Decl. ¶ 7)

payroll"; that ADP has decided to create more work for their own clients in order to attack Zenefits; that ADP is unethical in making changes to clients' payroll systems without permission; that ADP is unethical in attempting "to block Zenefits' service."

Nor can there be any dispute that Defendants' representations were either "made for the purpose of … promoting … sales … or commercial transactions in, [Defendants'] … services" or "made in the course of delivering [Defendants'] … services."  The June 5 email promotes sales of Zenefits services by, among other things:  assuring Zenefits clients (falsely) that what Zenefits does is no different from what ADP permits bookkeepers or accountants to do and that "Zenefits is still completely compatible with ADP payroll"; explaining Zenefits' work-around to provide its services despite ADP's deactivation of Zenefits access; assuring its clients that "nothing will interrupt your use of Zenefits" and that Zenefits is "also working on other options for restoring automated payroll."[5]

The June 5 email also confirms that the representations were "made in the course of delivering [Defendants'] … services."  Indeed, the June 5 email resulted from a change in Zenefits' delivery of its services because of its loss of access to RUN and explains Zenefits' work-around to continue to deliver its services so that "nothing will interrupt your use of Zenefits."

The second condition of Section 425.17(c) is also satisfied—that the intended audience was actual or potential buyers or customers.  The June 5 email confirms this in its first line: "We're emailing you as a Zenefits customer that uses ADP RUN for payroll."

The evidence requiring denial of Defendants' motion under Section 425.17(c) is far more compelling than the facts in the case law applying Section 425.17(c) to bar anti-SLAPP motions. For example, in *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294 (2014), the plaintiff sued Yelp, a well-capitalized company like Zenefits, seeking to enjoin Yelp's allegedly false claims on social media websites about "the accuracy and efficacy of its 'filter' of unreliable or biased customer

---

[5]     The "petition" started by Defendants on the change.org website also rails against ADP, touts Zenefits' business, and closes by stating: "Tell ADP's CEO, Carlos Rodriguez, to stand with his small business customers – and let them use Zenefits!"

1   reviews." *Id.* at 298.  Yelp, like Zenefits, attempted to squelch plaintiff's lawsuit by filing a

2   meritless anti-SLAPP motion.  *Id.*  The court of appeal held that Yelp's statements fell "squarely

3   within" the Section 425.17(c) exemption.  *Id.* at 305.  Yelp's statements about its review filter

4   consisted of "commercial speech about the quality of its product" and its intended audience was

5   actual or potential customers.  *Id.* at 310-12.  The court rejected Yelp's argument, rehashed by

6   Zenefits here, that Yelp's defamatory statements were mere opinion or puffery.  *Id.* at 311.

7        In *Weiland Sliding Doors and Windows, Inc. v. Panda Windows and Doors, LLC*, 814 F.

8   Supp. 2d 1033 (S.D. Cal. 2011), Weiland issued a press release to customers, vendors, and

9   publications touting its patent infringement lawsuit against Panda and urging contractors and

10  dealers to contact it about Weiland products.  *Id.* at 1037.  When Panda filed a lawsuit against

11  Weiland claiming intentional interference with prospective business advantage, Weiland brought

12  an anti-SLAPP motion.  *Id.* at 1035.  The court denied the motion, holding that the Section

13  425.17(c) exemption applied because Weiland's press release concerned its products, was

14  intended to promote their sales and was directed at actual or potential customers.  *Id.* at 1038; *see*

15  *also Sharper Image Corp. v. Target Corp.*, 425 F. Supp. 2d 1056, 1076-77 (N.D. Cal. 2006)

16  (claim based on email from manufacturer to retailers asking them not to carry competitors'

17  product exempt from anti-SLAPP statute under Section 425.17(c) because one purpose was to

18  promote manufacturer's products).[6]

19       Under its clear terms and controlling precedent, Section 425.17(c) exempts the causes of

20  action in ADP's complaint from the anti-SLAPP statute.  This is a case "where the special motion

21  to strike screening mechanism is unavailable."  Indeed, Section 425.17 was adopted to prevent

22  what Defendants attempt here—abuse of the anti-SLAPP statute by attempting to use it to chill

23  redress through a lawsuit for Defendants' defamatory commercial speech.  Defendants' motion

24  should be denied.

25       Defendants' conduct here, however, goes beyond mere abuse of the anti-SLAPP statute.

26  _____

27  [6]     While the Section 425.17 exemption was held to be inapplicable in *Gore*, that was
    because the challenged statements did not concern either the speaker's or a competitor's
    services.  *Gore*, 49 Cal.4th at 20.  Here, by contrast, Defendants' false statements concerned *both*

28  its own services and those of competitor ADP.

The applicability of Section 425.17(c) is so clear that Defendants' motion is totally and completely without merit.  ADP is entitled to an award of its costs and reasonable attorney's fees for having to oppose Defendants' motion.

**B.      Defendants Fail to Meet Their Burden to Show That Their Statements Were Made in Connection with an Issue of Public Interest and the "Public Issue" They Propose to the Court Is a Fabrication**

Even if Defendants' motion was not barred by Section 425.17, Defendants fail to meet their burden to establish that the anti-SLAPP statute applies to ADP's claims.  Defendants fail to show that their statements that are the subject of ADP's complaint were made "in connection with a public issue or an issue of public interest."[7]  Cal. Code Civ. Proc. § 425.16(e)(3), (4).

Defendants propose to meet this burden by fabricating a "public issue" that has no connection to their statements and is not a "public issue" in any event.  Defendants' claimed "public issue" is this: "using data lock-in to foreclose competition."  (Motion 1:28)  Or, as Defendants state it more pejoratively, how "old economy companies try to use data lock-in to preclude competition from new economy entrants."  (Motion 8:20-21)  But Defendants' "data lock-in" gambit fails.

First, whatever the term "data lock-in" may mean, and there are substantial questions about that and whether there would be any general consensus, it has no connection to Defendants' statements at issue in ADP's complaint.[8]  On their face, Defendants' statements in the June 5 email and change.org "petition" relate only to Defendants' complaints about Zenefits being denied access to ADP RUN, fact assertions about ADP's reasons for the denial of access to Zenefits, and advice to clients about how service will continue to be provided despite the denial of access.  Nothing is mentioned about "data lock-in" or data at all.[9]

---

[7]       Nor do Defendants meet their burden to show a "public forum" based on an email sent to 700 clients and a self-created online "petition."

[8]       No definition of "data lock-in" can be found in common sources available to the public, including the Merriam-Webster Dictionary, dictionary.com, TechTerms.com, or techdictionary.com.  Tellingly, there is no entry for "data lock-in" in Wikipedia, which even contains an entry for Defendants' much-beloved term "FUD."

[9]       Defendants do not even try to argue that there is a "public issue or an issue of public interest" in the dispute arising from ADP's denial of access to Zenefits to ADP's RUN system

Second, both Defendants' June 5 email and the Zenefits-created petition acknowledge, in their solicitations to ADP clients to switch to a different payroll provider, that ADP clients are not tied to ADP because their data is somehow "locked-in." And that is the fact. ADP does not own or exert control over the data of its clients. ADP's RUN contract provides that ADP "is not and will not be" the client's "record keeper," advises RUN clients to "keep copies of all source documents of information delivered to ADP in connection with the Services," and notifies RUN clients that they "are solely responsible for maintaining and backing-up any information" provided or used in connection with RUN. Moreover, the contract specifies that all client confidential information "will remain the exclusive and confidential property of the" client and that ADP will return all such information upon request. Typically, when an ADP RUN client wishes to switch to another payroll vendor, ADP assists the client in transferring its information. (McGinness Decl. ¶ 3)

Third, in all the media coverage Defendants have exploited regarding this lawsuit and their anti-SLAPP motion, Defendants have not said one word about "data lock-in" or any other kind of "lock-in."[10] Therefore, Defendants' motion should be denied because they fail to show that, even if "data lock-in" was a generally-understood term that was a matter of "public interest" (and it is not, as we demonstrate next), their statements at issue in this lawsuit have absolutely no connection to "data lock-in" and therefore no connection to this asserted issue of public interest.

But "data lock-in" is not an issue of public interest in any event. What do Defendants offer to support their assertion that "data lock-in" is a public issue? First, Defendants say that "Market analysts have long identified ADP's potential to benefit from data lock-in" (Motion 7:7), citing an April 30, 2015 Morningstar Analyst Note. But that's not true. The note says nothing

_____

and Zenefits' responsive tirade of false accusations about ADP. That is not the stuff of "public issue."

[10]     Defendants also argue that the "attention from large media outlets and the social media commentariat confirm that the statements at issue concern a matter of widespread public interest." (Motion 11:5-6) But the media attention, largely self-generated by Defendants, concerns the dispute between the parties, not "data lock-in." And, as noted above, even Defendants don't try to argue that the commercial dispute between the parties is a matter of public interest. It is not, and some invited media attention doesn't transform into a "public issue."

1   about "data lock-in," much less that anyone has "long identified" ADP's potential to benefit from

2   it.  While the "Economic Moat" portion of the note states that "Long-term contracts and the

3   difficulty inherent in switching outsourced human resources processes to another provider allow

4   ADP to lock clients into its services," that sentence says nothing about "data" and certainly

5   creates no "public issue."

6        Second, Defendants reference in a footnote (Motion, note 5) two dated technical articles in

7   obscure publications, without any explanation of how they relate to any "public issue."  They

8   don't.  One, from the "MIT Information Quality Industry Symposium" in July 2009, is entitled

9   "Data Portability: It is about the Data—the Quality of the Data."  It uses the term "data lock-in,"

10   concludes that "Solving the data lock-in problem requires simple awareness of what it takes to

11   create portable data and requesting or requiring that application and service providers adopt

12   international standards for data quality," and suggests no "public issue."  The second article, from

13   "Information Systems Research" in June 2012, is entitled "Lock-In Strategy in Software

14   Competition: Open-Source Software vs. Proprietary Software," does not mention "data lock-in,"

15   but instead refers to customer lock-in by software vendors, something inapplicable to ADP since

16   it is not a software vendor.

17        Two technical articles in obscure journals from three and six years ago, only one of which

18   uses the term "data lock-in," do not create "an issue of public interest."  Clearly, "data lock-in" is

19   not even an issue of particular interest in the tech industry.  It certainly is not a topic of any

20   interest to the general public.  California's anti-SLAPP law was not intended to be invoked by

21   anyone who manages to find two articles on arguably the same subject.  Rather, it has important

22   goals: "it is in the public interest to encourage continued participation in matters of public

23   significance, and that participation should not be chilled through abuse of the judicial process."

24   Cal. Code Civ. Proc. § 425.16(a).  Even if there were consensus on what "data lock-in" is, it is not

25   a matter of public significance.

26        Indeed, the law is well-settled that to assess whether the "public interest" requirement is

27   satisfied, the Court must "focus on the specific nature of the speech rather than the generalities

28   that might be abstracted from it."  *World Fin. Group, Inc. v. HBW Ins. & Fin. Svcs., Inc.*, 172 Cal.

App. 4th 1561, 1570 (2009).  "The fact that 'a broad and amorphous public interest' can be connected to a specific dispute is not sufficient to meet the statutory requirements" of Section 425.16.  *Id.* (abstract public interest in employee mobility did not support anti-SLAPP motion against complaint charging employees with misappropriating employer's trade secrets).

As an example, a trade organization's certification of health products as "organic"—leading to a complaint for unfair competition—did not involve an issue of "public interest," and the party filing an anti-SLAPP motion could not change that result by referring to a general public debate about the meaning of The term "organic."  *All One God Faith, Inc. v. Organic & Sustainable Indus. Stds., Inc.*, 183 Cal. App. 4th 1186, 1210 (2010).  The fact that a large number of people might be affected by the advertising cannot satisfy the "public interest" requirement.  *Id.* at 1209.  Nor can one transform a private dispute into a "public issue" by communicating it to a large audience.  *Id.* at 1201.

In short, Defendants' statements at issue do not involve any public issue.  None of the defamatory statements that are the subject of ADP's claims relate to "data lock-in" in any manner.  Just as the claim for theft of trade secrets in *World Fin. Group* could not be generalized to "employee mobility," neither can Defendants' false statements about ADP's reason for denial of RUN access be abstracted to "data lock-in" (even if there was consensus on what that term means).  This Court should conclude that "data lock-in" is not a "public issue" and that therefore Defendants fail to establish a necessary element of Section 425.16.  Defendants' motion should be denied.

This is not even a close case.  Because "data lock-in" is no "public issue" and Defendants' statements do not relate to it in any event, Defendants' motion is frivolous.  Moreover, the media coverage Defendants promoted in conjunction with their motion suggests a public relations motive, and therefore the motion was made for the sole purpose of harassing ADP.[11]  ADP is

---

[11]     Defendants' orchestrated media coverage on July 7 to trumpet their anti-SLAPP filing, including: an interview in The Recorder with Zenefits' general counsel entitled "Zenefits GC Fixes for Fight With ADP"; a San Francisco Business Times article entitled "Zenefits slings legal shot at ADP, hopes it kills giant lawsuit"; a report on LinkedIn entitled "Zenefits to ADP: You Can't Shut Us Up"; and an interview of the Zenefits' COO on Bloomberg, entitled "ADP Lawsuit

1   entitled under Section 425.16(c)(1) to an award of costs and reasonable attorney's fees for having

2   to oppose it.

3       **C.    ADP Easily Demonstrates a Probability of Prevailing on Its Claims**

4       Because the Section 425.17(c) exemption applies, and because Defendants fail to meet

5   their burden to demonstrate the requisite "public issue" under Section 425.16, Defendants'

6   motion should be denied, and there is no basis to inquire into the merits at this pleading stage.

7   *Yelp,* 228 Cal. App. 4th at 312.  Nevertheless, had Defendants met their initial burden, ADP

8   easily demonstrates a probability of prevailing.

9       The standard for "reasonable probability" under Section 425.16 is not onerous.  It means

10  "only a minimum level of legal sufficiency and triability."  *Graham-Sult v. Clainos*, 756 F.3d

11  724, 740 (9th Cir. 2014).  ADP need only show that "the complaint is both legally sufficient and

12  supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the

13  evidence submitted by the plaintiff is credited."  *Id*. at 740-41.  The Court does not weigh the

14  credibility or strength of competing evidence at this stage.  *Doe v. Gangland Prods., Inc.*, 730

15  F.3d 946, 957 (9th Cir. 2013).  On this standard, ADP easily establishes "reasonable probability."

16  In addition to the brief discussion below, ADP addresses this in its opposition to Defendants'

17  motion to dismiss.

18      **1.    ADP Demonstrates a Probability of Prevailing on Its
            Claim for Defamation**

19      Defendants assert two arguments against ADP's defamation claim: (1) that the defamatory

20  statements are mere "opinion," and (2) that their statements were "true."  Both arguments fail.

21          **a.    Defendants' Statements Are of Fact, Not Opinion**

22      On their face, the numerous representations in the June 5 email and the several in

23  change.org "petition" are statements of fact, not opinion.[12]  In any event, whether those

24  Is 'Incredibly Ironic': Zenefits COO Sacks."  (Kwon Dec. ¶ 7)  Of course, none of this self-

25  generated press creates a "public issue or an issue of public interest."

26  [12] They include, in summarized and abbreviated form: (1) "without your permission, ADP
    systematically deactivated"; (2) "The reason for this is … build software to compete"; (3) "The

27  reason for this is … do anything they can to impede"; (4) "claiming they are taking this action for
    'security' reasons"; (5) "What Zenefits does is no different"; (6) "Zenefits is still completely

28  compatible"; (7) "All they've done is make it more inconvenient for you"; (8) "ADP has decided
    to create more work for their own clients in order to attack Zenefits"; (9) "outrageous … making

1  statements *could* be interpreted as non-actionable opinion is a question for the trier-of-fact. *See*

2  *Sanders v. Walsh*, 219 Cal. App. 4th 855, 863 (2013) ("The question is whether a reasonable fact

3  finder could conclude the published statement declares or implies a provably false assertion of

4  fact.") Therefore, ADP has a probability of prevailing on this issue.

5  **b.      Defendants' Representations Were Not True**

6          The following facts, set out in the Anderson and McGinness declarations, establish that

7  Defendants' statements in the CEO Conrad June 5 email and the change.org "petition" are false:

8  the sole reason for denying Zenefits access to ADP RUN was the database interference caused by

9  Zenefits' automated processes; ADP's RUN contract gave ADP permission to restrict access to

10  RUN without notice; Zenefits' automated processes for accessing ADP RUN are entirely

11  different from how authorized third parties obtain information from ADP RUN; Zenefits was

12  never integrated with or compatible with ADP RUN; ADP's action in restricting Zenefits' access

13  to ADP RUN affected about 700 joint clients, who remain able to access ADP RUN directly;

14  ADP's RUN contract places restrictions on who can administer accounts for its RUN clients.

15  (Anderson Decl. ¶¶ 2, 5-10, 12-14; McGinness Decl. ¶¶ 4-6) That is more than enough to

16  establish that the complaint is "both legally sufficient and supported by a sufficient prima facie

17  showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is

18  credited."

19  **2.      ADP Demonstrates a Probability of Prevailing on Its
Claim for Intentional Interference**

20

21          Defamation constitutes sufficiently "wrongful" conduct to form the basis of a claim for

22  intentional interference with prospective economic relations. *See, e.g.*, *Korea Supply Co. v.*

23  *Lockheed Martin Corp.*, 29 Cal.4th 1134, 1159 (2003) ("[A]n act is independently wrongful if it

24  is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law,

25  or other determinable legal standard.") As demonstrated above, ADP has evidence to support its

26  these changes without your permission"; (10) "unethical … making these changes without your
   permission"; (11) "ADP … is creating this complication for you in their attempt to block

27  Zenefits' service"; (12) "ADP … has cut thousands of their small business customers off from
   using Zenefits"; (13) "ADP client can set up anyone in the world to administer their payroll --

28  except those with a Zenefits email account".

14

1   defamation claim and therefore, at a minimum, a probability of prevailing on the intentional

2   interference claim as well.

### 3.   ADP Demonstrates a Probability of Prevailing on Its Unfair Competition Law Claim

3

4

5           In its opposition to Defendants' motion to dismiss, ADP establishes that it has properly

6   pleaded a UCL claim.  Because it is based upon facts that support the defamation and intentional

7   interference claims, which are set out in the Anderson and McGinness declarations, ADP has

8   establish that the complaint is "both legally sufficient and supported by a sufficient prima facie

9   showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is

10   credited."

### D.   ADP Is Entitled to Its Costs and Reasonable Attorney's Fees Incurred in Opposing This Frivolous Motion

11

12          ADP requests under § 425.16(c)(1) its costs and reasonable attorneys' fees for opposing

13   this frivolous motion.  California Code of Civil Procedure § 128.5 defines "frivolous" as "totally

14   and completely without merit" or "for the sole purpose of harassing an opposing party."  As

15   established above, Defendants' motion is "totally and completely without merit" because it is

16   clearly barred by Section 425.16(c), because it fails to meet its burden of proof by fabricating a

17   "public issue" that is not connected to Defendants' statements at issue and that is not a "public

18   issue" in any event, and because ADP demonstrates a probability of success.  Moreover, given the

19   press Defendants generated regarding their motion, it appears to have been a public relations ploy

20   and therefore intended solely to harass ADP.

## IV.   CONCLUSION

21

22          For the reasons stated above, Defendants' motion should be denied.  Because the motion

23   is frivolous, ADP is entitled to an award of its costs and reasonable attorney's fees incurred in

24   opposing it.

25   Dated: July 21, 2015                              MORGAN, LEWIS & BOCKIUS LLP

26

27                                                    By:  /s/ Robert A. Lewis
                                                          Robert A. Lewis
28                                                        Attorneys for Plaintiff ADP, LLC